The first case on the docket today, this afternoon, is 5-14-021 Wright v. Moss. Counsel ready? May it please the court. Counsel, my name is Eric Terlizzi. I represent the plaintiff's account in this cause. This is a rather unusual case in that it calls for an interpretation of the Coroner's Act. There is very little cause, apparently, to interpret that act over the course of the history of Illinois. Essentially, I think the salient facts here are really undisputed. And that is that on March 31, 2009, a gentleman by the name of Dale Wright passed away. He was 88 years old. He was quite sick, had multiple serious medical conditions. He had just had an extensive hospitalization, followed by rehab at a nursing home, and had gotten back home, discharged home, a couple of months before he passed away. He passed away quietly in his home. His wife was present, who was the plaintiff in this case, Sharon Wright. She immediately called the funeral home that he had indicated he wanted to handle his services. They, because the death occurred in the home, appropriately called the coroner of Clinton County. Coroner Moss sent his assistant coroner, who just happened to be his father, David Moss, to the Wright residence. He inspected the body, declared him deceased, and had a brief conversation with the widow, Sharon Wright, asked who his physician was, who happened to be Dr. Sapaya in Salem. Assistant coroner Moss called Dr. Sapaya, reported the death. Dr. Sapaya, in the course of that very brief phone conversation, immediately said, I will sign the death certificate. He had been Mr. Wright's long-term physician and was well aware of his multiple serious medical conditions. Sometime thereafter, Neal Funeral Home, then the desired funeral home, came to the Wright residence, removed the body, took it to its funeral parlor in Louisville, Illinois, for preparation of the body. Later that same day, March the 31st, the coroner's office received a call from a cousin of Mr. Wright's, who provided the following information. This was the entire statement. That Plamp, the widow, was younger than Mr. Wright, that she had been involved with older men before, and that there were assets, and that was the extent of the information. On the same day, coroner Moss wrote a memo for his file, indicating that he had determined to conduct a random, in his words, random autopsy of Mr. Wright. Based on that decision, he went, retrieved the body from the funeral home in Louisville, drove the body to East St. Louis Hospital, and the very next morning, April the 1st, a pathologist, Dr. Nanduri, performed an autopsy. Her deposition was taken. She described that in some detail. Essentially, Mr. Wright's body was cut from stem to stern. All his vital organs were removed, away, samples taken. Those organs are put back in a bio bag and stuffed back into the empty body cavity, and the body is sewn back up. Standard thing that happens in an autopsy. Exactly, Your Honor. Nothing unusual about this autopsy. A very standard autopsy. Dr. Nanduri found in her, based on her preliminary, just the physical autopsy, that there were multiple conditions, heart, problems with the heart, lungs, liver, spleen, kidney, and reached a conclusion of the preliminary cause of death was acute bronchopneumonia. On the very next day, April 2nd, the coroner sent a letter to St. Louis U. toxicology department, specifically suggesting, requesting toxicology tests to be run on Mr. Wright's bodily fluids, indicating this gentleman was possibly a victim of poison. The autopsy showed no evident signs as to the cause of death. Spouse of the deceased had prior marriages and relationships with older gentlemen that had also resulted in death were either written off as natural or accidental. What was the age difference? I mean, he mentioned last night. He was 88 when he died, and within a year or two, she was about 62 or 63, I think. Yes, about maybe 25 years in that ballpark. She was not an 18-year-old, I can tell you that. When Coroner Moss retrieved the body from the funeral home, he specifically told the funeral home there not to tell Mrs. Wright that they had taken the body, that an autopsy was performed. Of course, thereafter, the toxicology reports came back completely negative. The pathologist issued her final report saying, It's the same as my preliminary report. This man died a natural death of pneumonia. Now, this took, by the time the toxicology reports and everything, we're talking about sometime in the early May, the second week of May. During some period of time, Mrs. Wright is calling up the funeral home saying, I need death certificates. I can't get my insurance paid. I can't get this done. I can't get that done. And poor Mr. Neal, the funeral director, is just putting her off making excuses because he's been told not to tell her that her husband has been dissected in an autopsy. Just after he was buried? Oh, yes. This extends all the way out into May. He was buried, I don't remember the date of burial, but it was just obviously a couple days after the autopsy once the body was returned. Finally, when Mr. Neal gets tired of getting his phone calls from her, he says, Call Mr. Moss. She calls Mr. Moss. At that time, she is told, Well, you haven't got a death certificate because we were waiting for these toxicology results to get the final result of the autopsy, but now apparently they've already had them. And he said, I'll send you a copy. No, he didn't tell her. He just told her that the autopsy had happened. He specifically told her she inquired as to why and told her what was a random autopsy. Exactly as he had said in his memorandum the very day this autopsy was ordered. He then, without her knowledge of request, mailed her a copy of the autopsy. It just showed up in her mail one day. The record also indicates that the estate attorney at the time called and asked what was going on and was told the same thing. Well, I decided to do a random autopsy. What's the legal significance of him calling it a random autopsy? Well, I think it's very significant because the statute here has any meaning at all. It doesn't use the word random. It doesn't prohibit random autopsies, but it authorizes the coroner in the absence of family consent to conduct an autopsy only if the death is suspicious, obscure, mysterious, or otherwise unexplained and in the opinion of the examined physician or the coroner, the cause of death cannot be determined. Now, it's in the record in this case, and we have to remember, and I guess I skipped over this, Your Honors, but this case was decided on summary judgment. We haven't had a trial here. This was summary judgment in favor of the defendant. Was that based on the Tort Immunity Act? Yes, yes it is. All right. And it goes on to say, even though abused. Correct. And I think the courts have said that eliminates willful and wanton conduct as well as negligence. So, I mean, I'm trying to get where you're at here. So are you saying because he called it random, he didn't exercise any discretion? Well, Your Honor, we think that a jury is entitled to determine how. The issue isn't did he cause it random. It's was it a random autopsy. And if it was random, obviously it's the antithesis of discretionary decision. Well, that's what I'm trying to ask you and you're saying. We cited some case law in our brief that says, you know, when a party makes an admission and then later attempts to qualify or disclaim that admission, that's a jury question. Well, didn't he make a choice to say it was random? Didn't he make a choice in this case to perform a random autopsy? He could have not performed a random autopsy. But I think if you take that position, Your Honor, then the statute essentially is meaningless. Because the statute says you can conduct what, you know, an autopsy is a significant event to the law. And that's why the legislature, and this is an old, old statute. This isn't anything new. It puts some limits on it. I mean, if coroners were to flip a coin and say, or say we're going to do every 10th body that comes in through here, whether it's a person who's 100 years old and on death's doorstep for 10 years or not, then the statute becomes meaningless. And the statute has to have some meaning. It's supposed to put some standards on a coroner. And the only standard it puts on it is essentially exactly what he did here. You can't do it randomly. You exercise your discretion. You determine what's suspicious or obscure or mysterious. But you can't just flip a coin and say I'm going to do this guy and not the next guy. And that's what he's saying. Okay. So, you know, maybe he's wrong. But, I mean, we're talking about immunity. Doesn't immunity bar recovery from someone even if they were wrong? Even if they were wrong in the exercise of discretion. If you're weighing the pros and cons and you say, okay, that's my job. I have to decide is this mysterious, is this obscure or something, and make that decision, that decision can't be questioned or damages can't be awarded because of the decision you make. In that, as a public official in that instance. But if you say I'm given discretion here, but all I'm going to do is flip a coin, or like I said, you know, decide as an office policy every tenth body that comes through here is going to get autopsy, again, what does that statute mean? Well, you know, maybe if he was doing that to every tenth body, that would be abusing his discretion. But the statute specifically says he's immune even though his discretion is abused. That's what it says. So tell us, you know, I mean, really. Maybe we're reducing ourselves to an argument of semantics here. But I think the semantics is the guts of this case. And if we're wrong, you certainly can tell us we're wrong. So you said random when really it was maybe like alleging a semi-probable cause or something, where an ex-police officer is good. There's a probability here of something. Yeah, and that's why I think at some point in this case that it's a jury question as to whether he can disclaim that admission, that I didn't use any discretion, I didn't use any thought. Random means exactly the opposite of giving. Maybe random doesn't mean random here really. Well, then let him get in front of a jury and say that. I put it in writing. I told the attorney random. I told the widow random. I wrote it in my own memo the day it happened that this is random. But I didn't really. I really gave this some thought. If they're going to buy that, they'll come to me with a defense verdict. But I think we're entitled to present that to the jury and say, you know what the word random means. That's not some, you know, esoteric legal term. Maybe he didn't know what the word random might have said. I don't think he said that. And like I said, it's not an esoteric legal term. I mean, you walk up to somebody in the street and say, what does random mean? And they go, well, flip of the roll of the dice, flip of the coin, something totally without, something totally by chance. That's what the word random means. And I think that's what he said. And I think he used that word. I think a successful argument could be made to a jury that he used that word because he didn't qualify for the statute. He didn't have any evidence. In fact, he admitted when he left there, there was nothing about the death itself. His father had reported to him there was nothing about the death that was suspicious, obscure, mysterious, or otherwise unexplained. The physician was clearly willing to certify the cause of death in this man. And then he went back and got this phone call, and I don't know what his thought process was. Maybe it developed more in a jury trial. But clearly it was that he didn't have a basis, you know, to suggest that this death at that time was suspicious, obscure, mysterious. So he said, all right, I'm just going to order a random autopsy. And I think he thought he had the legal authority to do that. He was dead wrong. He did not. And I don't think that's an exercise of discretion. I mean, any more than trying to think of an example of another government entity. A county board that can exercise discretion in awarding contracts says, well, we're not going to exercise discretion. We're going to give it, you know, we're going to flip a coin. I mean, if he had exercised discretion, he would have immunity. If he would have said, I think based on what I have, this death was suspicious. Even if he, you know, objectively was wrong, if he could be questioned about that. But to simply say, I'm going to ignore my statutory duty to determine whether something fits first before going to step two. And to say, I'm going to randomly go to step two and skip step one is what this statute says he cannot do. And, again, I think the main point is if this conduct can be upheld, then the statute is meaningless. Why have it there? Is there a difference between him not following the coroner's statute or violating the statute and whether or not he's immune for not violating the statute? You understand what I'm saying? I mean, I mean. I think not, because his immunity comes only from exercising discretion. Doing some act which involves the exercise of his statutory discretion. I mean, if he's doing some act totally outside of his statutory rights or duties, then he's not even acting as a public official. But he has to be exercising, making some decision that involves some kind of exercise of discretion. And then I agree, immunity applies. Whether he was right, wrong, was the craziest decision you ever heard of. If it was an exercise of discretion, but to specifically say, I'm not going to exercise discretion. I'm going to make a random decision. I just, I know I don't have the discretion to do it in this case because it doesn't apply. So I'm just going to say randomly we're going to do an autopsy on this guy. And that's what we think is the jury question here, for a jury to decide. And it was improper for the court to decide on summary judgment. Thank you, counsel. Thank you. Thank you. I'm Joe Golier. I represent the Clinton County Court of Phil Moss in this particular case. And we're here asking this court to affirm the grand and summary judgment that was entered by Judge McCain back in Marion County. From listening, sitting there listening to the questions, I'm going to change my argument a little bit. First thing I want to point out that Mr. Terlizzi wants to emphasize the word random. There's no question that was used. And I was kidding Mr. Terlizzi that I wish I had a word count program to count how many times he used the word random in his brief and his reply brief. But we're not here on a motion to dismiss. And I think that's what the distinguishing. There wasn't a motion to dismiss file. And if this court had granted a motion to dismiss under the statute on the basis of the word random, I think the plaintiff here might have an argument. But what we have here is a case that the court considered all the facts and like most people to the plaintiff. And the facts, and I think that it's quite clear that I want to emphasize the facts that were left out in the plaintiff's brief and the argument today is there's no question this gentleman was an elderly gentleman. He had a younger wife, somewhere in the 60s, that he'd been sick, that he died at home, that the coroner's father, who was an assistant coroner, went to the house, picked up the house, picked up the body, took it to the funeral home. Later that day, Philip Moss, the coroner at the time, did receive this telephone call from a gentleman that identified himself as a retired state police officer, a family or some kind of family connection to the decedent, and made some inquiries or some suggestions that there may be something suspicious, obscure or mysterious about the death. The plaintiff leaves out, and it's very clear, I think, in this thing about how when we get to the discretion, we get to the issues of whether or not it's suspicious, obscure or mysterious. Philip Moss, the coroner, he goes and talks to the sheriff of Clinton County. He discusses his concerns. He then calls in the chief deputy of Clinton County to discuss his concerns about this telephone call and things of that nature. Only after discussing with those two and receiving the telephone call, and both the sheriff and the deputy sheriff made some mention, essentially, to the fact, come back with us if you find something. It was at that juncture that he then had the autopsy performed. Did we have your client's testimony? I mean, was there a deposition? Yes, sir. It was a deposition. And did he say, after I got this call, I felt I couldn't ignore it? I mean, what was his explanation for why he ordered the autopsy? He was concerned because of this information. He thought his depositions attached and also the deposition of the sheriff and the chief deputy were also attached or part of the record. He essentially said, hey, I got this call. He thought there was some validity to it when the guy didn't call him a retired state trooper. And that's what he said in his deposition, that it was not only just a call. It was a family member who said, I'm a retired state trooper. I agree that there's nothing for you to go check and make sure he was. He took him at his word. And then that's when he went to the sheriff first. The sheriff called him the chief deputy. Then they had this discussion, hey, go with it. Call us back if there's some information that you find. So did the trial court essentially find, based upon all the evidence viewed in the light most favorable to the plaintiff, that the coroner did exercise discretion? I mean, he didn't specifically make that finding, but no, he didn't make that finding. And we were discussing this beforehand here today. And I can remember sitting there and I made a comment that Judge McCain was sitting on the bench and the Westport has kind of warmed up. He was looking out the window and he kept going over the facts. He was going, got the call from the state trooper, talked to the sheriff. You know, I don't see it being willful wanton. You know, it's not a disregard. He had some information. It's not like he just decided to do it. He had some valid information and it was some concern. And the thing about it is, granted, in this case, it turned out that there was nothing there. But I guess then, maybe this is what CSI is making fun of these days. We have this mysterious death. But I mean, the coroner, he had some valid information. He just didn't do it on a whim. He didn't give any conscious disregard. And they want to make light that they didn't tell the family that they were going to do it. They went and took the body. And back to the trial court, you certainly wouldn't tell the person that you think might have something to do with the death. That you're going to say, hey, ma'am, we think you might have something or someone on your side. We're going to take the body and go check you out. I mean, and so there's, it's got to be some secret about it. And it's, there's nothing that says you certainly wouldn't tell the person. So if you have some suspicious that was only the only person there when he passed away, that you might have a concern that there might be something in there. Well, it seems like, based on what was before him, the trial court could have, within his order, been finding this was not random. It was because this guy called him. I mean, despite what he said, you know, this all came about because of the phone call and so on. And Judge, we had, and I don't know if that, I don't believe the oral argument was, I can't recall. I apologize if the oral argument was part of the record. But we had this discussion, you know, and the judge was saying, you know, he had this information, he had this. And if you look at the record, it was kind of, we had the argument on a motion to dismiss right before the court. And then we had a discussion. That's when Judge McCain was saying, well, this, you know, he had this thought. It's certainly, you know, it's reasonable for the coroner to have this information to do what he did, regardless of what you want to call it, under the statute and under his discretion. And just to give you a little insight, after that, we decided he was going to grant it. And we got to the side of it. I think Gary, Mr. Kerlizzi, asked to file a leave to add the Wolf and Watch count. We added count two. And then we had a discussion. We might end up in front of this honorable court, and it would probably be best since the findings he was making that we did it on a summary judgment and a motion to dismiss. So the procedural fact was Mr. Kerlizzi filed his count two. We filed an answer. Then we filed a motion for summary judgment. And then so there was no really – the judge, unfortunately, because we had the oral argument and then we did all these procedures, so there was no written findings specific. And that's why the record will not show any oral argument on the motion for summary judgment. That's how we kind of set it up to get to this. So I think under either statute you go to, I think regardless of what it's called, and like I said, it's a summary judgment. We have the testimony of why he did what he did. Under the Coroner's Act, I think that because of his suspicion of mysterious, he had the right to do it. And I think regardless of what happened under the Coroner's Act, I think it's just as you pointed out, regardless of rule for one, there was no question. I mean how more discretionary can you get than a coroner making a decision whether or not he's going to take and do an autopsy? I mean this court has had this issue, discretionary, ministerial. You know, you think back to the first case that they talked – made this distinction in the 161 partnership case. You know, the fire chief was deciding how to make the fire go out. And when the person opened the door and got hurt, it was – said it was his discretion. I don't remember the name of the case. I remember the sewer backup case that you offered to the West Altman. They put the pump in and you said putting the pump in or out is at the discretion of what you put it in. Turned it on or off when the weather says that's ministerial. But I mean in this particular case, how more discretion can you get than the coroner saying got this information, talked to the chief sheriff, talked to the deputy sheriff, the relative called. I'm here to make a call. It's my decision only. It's my discretion. I'm going to make the call to make the autopsy. And judges, as you pointed out, Judge Stewart, the Supreme Court has said under 2201, it's all immunity. There's no wealth and want exception to it. It's – and I think also – I mean you don't need immunity for making a good decision, right? Well – You need immunity for making a bad decision. So just because it's a bad decision doesn't mean you're not still immune, right? That is true. But I guess every decision on one side of the thing is good and one side of the thing is bad. But I agree with you. My point is let's say he violated the statute and it was not a circumstance where an autopsy was proper. He's still immune. That is correct. Is that the way you understand it? Yes, sir. I mean under the Tort Immunity Act. Yeah. And I think even though someone might think it's absurd, I mean the statute is pretty clear. And it's what we got to go by. And so I think in light of not only the information he had and in light of 2-201, the court was correct in granting the motion for summary judgment. And we're here asking it to be affirmed. And I think unless anybody else has any further questions today, thank you very much. Counsel. Mr. Baumann. I agree that a trier fact would look at this and say despite the fact that he told the attorney, despite the fact that he told the widow, despite the fact on the day the decision was made, he put in black and white that this was random, we think he really did exercise discretion and therefore immunity applies. But I think a trier fact could do the opposite too. It could say this man repeatedly said and put in writing on the day the decision was made that this was random. It had nothing to do with discretion. You know, to be honest, if I was a betting man, I bet if we go to trial, Joe's probably going to beat me. He usually does. But in this case, I think we're at a point where we've got a chance, we should have the opportunity to present these facts to a jury and let them make a decision as to whether what he said was true or whether after the fact it was not in fact random and he was exercising discretion, as you say, Your Honor, whether it was right or wrong. If a jury, a fact finder, would conclude that, for example, on a special interrogatory to a jury, did the coroner exercise discretion in making this decision, and they would come back yes, that seals our faith. But I think we're entitled to that trial. Thank you, counsel. Thank you. Would you be excused? Thank you.